IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

LOYDELL VESTAL                                                    PLAINTIFF

v.                              Civil No. 04-2261

JO ANNE B. BARNHART, Commissioner,
Social Security Administration                                    DEFENDANT

## MEMORANDUM OPINION

Plaintiff Loydell Vestal brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial

review of a decision of the Commissioner of the Social Security Administration denying his

application for disability insurance benefits (DIB) under the provisions of Title II of the Social

Security Act and his application for supplemental security income (SSI) benefits under Title XVI

of the Social Security Act.

## Procedural Background:

On July 20, 2000, Vestal protectively filed applications for DIB and SSI benefits.  (Tr.

125-127).[1]   Vestal alleging a disability onset date of April 23, 2000.  (Tr. 20, 155).     An

administrative hearing was held on May 14, 2002  (Tr. 723-758).  Vestal, who was represented

by counsel, appeared and testified.  (Tr. 723-758).

By written decision dated July 3, 2002, the administrative law judge (ALJ) found Vestal

not disabled within the meaning of the Social Security Act.  (Tr. 77-86).  Vestal appealed the

_____

[1]While his initial applications were in the appeals process, Vestal filed subsequent applications for DIB and SSI on July 16, 2002, alleging a disability onset date of July 4, 2000.  (Tr. 20).  These applications were denied initially and on reconsideration and a timely request for hearing was made.  (Tr. 20, 90-93,95-96).  As the applications related to the same adjudicatory time period as the July 2000 applications, the July 2002 applications were incorporated into the ALJ's October 7, 2003, decision.  (Tr. 20).

AO72A
(Rev. 8/82)

decision of the ALJ to the Appeals Council. (Tr. 113). The Appeals Council remanded the case for a further hearing. (Tr. 115-118).

A supplemental hearing was held on August 11, 2003 (Tr. 37-72). On October 7, 2003, the ALJ issued an unfavorable decision (Tr. 17-29). He concluded Vestal had an impairment or combinations of impairments that were severe including a back condition the result of a lumbar herniated nucleus pulposus, status postoperative and coronary artery disease, status post two myocardial infarctions. (Tr. 22). However, after reviewing all of the evidence presented, he determined that Vestal's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation 4. (Tr. 22).

With respect to the nonexertional impairment, depression, the ALJ found no objective medical evidence on which to base a conclusion that the depression had more than minimally impacted Vestal's ability to perform substantial gainful activity at any level. (Tr. 22). The ALJ concluded Vestal's nonexertional mental impairment was nonsevere. (Tr. 22).

The ALJ found Vestal had the residual functional capacity (RFC) to engage in a significant range of sedentary work. (Tr. 27). The ALJ found Vestal could not perform any of his past relevant work. (Tr. 26). He found he could do work as a sedentary and unskilled cashier or assembler. (Tr. 27).

Vestal appealed the decision of the ALJ to the Appeals Council. (Tr. 14, 16). The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied Vestal's request for review. (Tr. 8-10).

-2-

**Evidence Presented:**

At the supplemental hearing before the ALJ on August 11, 2003, Vestal testified he was forty-five years old. (Tr. 44). Vestal testified he had a heart attack in 2001 and one in 2003. (Tr. 42). After the second heart attack, an angioplasty was done and four stints put in. (Tr. 49).

Vestal is not followed by a cardiologist. (Tr. 52 & 62). Following the placement of the stents, he had a nuclear stress test but never found out the results. (Tr. 62).[2]

Because of his heart, Vestal testified he has been told to stay in a "light duty manner." (Tr. 51). Vestal takes a time released nitro tablet every morning and takes a blood thinner and anticoagulant. (Tr. 51). Vestal indicated he also had nitro tablets he takes only when he experiences chest pain. (Tr. 54). Recently, he testified he had been taking a couple of those a day. (Tr. 54).

Normally, Vestal testified when his chest bothers him, he will take a nitro pill and then go lay down on the bed. (Tr. 55). After about five or ten minutes, he takes another one. (Tr. 55). Usually the pressure relieves and he then sleeps for an hour or two. (Tr. 55). When he wakes up he feels better. (Tr. 55).

The chest pain is brought on by any excessive walking or fooling with his dog. (Tr. 55). His dog is a big dog, a Rottweiler. (Tr. 55). Heat also bothers him a lot. (Tr. 55). Vestal was asked to explain what he meant by excessive walking. (Tr. 55). He stated that its about two blocks across pasture to his mother-in-law's house. (Tr. 55). If he does that a couple of times a day, it starts to bother him. (Tr. 55). Or, if he walks two or three times around the pond, the

---

[2]The test revealed Vestal's ejection fraction was 55. (Tr. 476). A later test showed the ejection fraction was 45. (Tr. 722). An ejection fraction is the measurement of blood pumped out of a filled ventricle with each heartbeat. www.mayoclinic.com/health/ejection-fraction/AN00360 A normal ejection fraction is 55 percent to 70 percent. *Id.*

next day his back will be bothering him and his chest pains will be elevated. (Tr. 55). Vestal testified he would have to stay in the house one or two days following excessive walking. (Tr. 56).

Vestal testified he doesn't sleep well. (Tr. 56). He usually goes to bed around midnight and by about 2:00 a.m. he is awake, laying in bed, tossing and turning. (Tr. 56). He indicated his back pain wakes him up. (Tr. 56). He indicates he gets three or maybe four hours of sleep a night. (Tr. 56). While he doesn't take a nap everyday, there are days he takes a nap around two in the afternoon and sleeps for an hour or two. (Tr. 57).

He is 5'2" tall and weighed 210 at the time of the hearing. (Tr. 44). He had put on weight since his heart attack. (Tr. 44). He stated he would like to get down to 170 but hadn't been able to. (Tr. 44).

At the time, Vestal lived with his wife and sixteen year old daughter. (Tr. 44). They live in a mobile home located on his mother-in-law's property. (Tr. 52). The property is a forty-acre farm but there are no animals other than Vestal's dogs which he keeps outside. (Tr. 52-53).

Vestal testified he has a high school diploma and attended junior college for a welding trade and obtained an Associate Degree. (Tr. 45). With respect to his past work, Vestal indicated he had worked as a welder, a diesel mechanic, and owned his own oil field equipment truck. (Tr. 45-46). His father also owned four trucks but now only has one truck. (Tr. 46-47).

Vestal indicated his father had gotten rid of the other trucks following Vestal's back surgery in 1993. (Tr. 47). Vestal hurt his back on the job when putting a load of asphalt in a trailer. (Tr. 49). He slipped off a ladder. (Tr. 49).

-4-

Vestal testified he had a second back surgery in 1999 or 2000. (Tr. 47). He was working as a mechanic and as a result of the work he was doing and the lifting he ended up with compressed nerves. (Tr. 50). A surgical procedure was done to decompress the nerves but Vestal testified it never really relieved the pain. (Tr. 50).

Vestal still has his commercial driver's license (CDL). (Tr. 48). He has maintained the license in case something happened to his Dad and Vestal had to bring the truck back to the shop. (Tr. 48).

On an average day, Vestal testified he gets out of bed about 4:30 a.m. or 5:00 a.m., drinks a pot of coffee on the front porch and then sometime in the morning eats breakfast and takes a shower. (Tr. 48). After that, Vestal testified he basically just fools around with his dogs or fixes something minor on the lawn mower. (Tr. 48). He walks about a block every morning for exercise but gets out of breath easily. (Tr. 48).

Vestal does a little fishing but hasn't gone hunting in a long time. (Tr. 53). He testified he is afraid to get out there alone in the woods because he loses track of time really easy. (Tr. 53). For example, following his second heart attack, Vestal stated he went down to the river bottom to watch the geese in the field, which was about a quarter of a mile away, and sat down beside the river and didn't realize until it was getting dark what time it was. (Tr. 53). By then, people were out looking for him. (Tr. 53-54).

Vestal takes Paxil for depression. (Tr. 58). He testified he forgets the time easily or gets sidetracked easily. (Tr. 58). He indicted he doesn't deal with people well and flies off the handle easily. (Tr. 59). He estimated his depression is one-half as bad with medication as it was without medication. (Tr. 59). He indicated he still doesn't care what he looks like, doesn't

-5-

shave for a week and a time, there are days he doesn't get out of bed, or just sits in his recliner and watches the fish swim. (Tr. 60).

When he is in a stressful situation or under pressure, Vestal stated his chest pains come back and he gets real angry. (Tr. 59). With respect to financial stress, he testified he didn't deal with it and just lets his wife do whatever. (Tr. 60).

Vestal testified the medication causes him to suffer constipation, he gets lightheaded if he moves quickly, the heat bothers him a lot, and he gets dry mouth. (Tr. 57). Vestal indicated the daily Nitro medication he takes and another one of the heart medication states on the label that you should avoid sun. (Tr. 57).

Vestal testified he can tolerate sitting in a chair about thirty minutes. (Tr. 60). He testified he can stand in one spot for fifteen or twenty minutes but if he has to do a lot of standing he has to pick one foot up off the floor and then alternate feet or move around. (Tr. 61). After he walks a little ways, Vestal testified his left leg goes numb to about the knee and his right leg goes numb all the way to the toes. (Tr. 61). He experiences this numbness after walking about half a block. (Tr. 61). He also gets short of breath and has to sit down or stand there a few minutes and then go on. (Tr. 61).

Vestal testified he can carry around five pounds without it bothering him. (Tr. 61). When he lifts or carries a gallon of milk or tea Vestal testified he starts feeling the pressure in his lower back. (Tr. 61). He indicated he could not tolerate lifting either weight repetitively all day long. (Tr. 62).

Vestal testified he had recently been in the hospital for vertigo. (Tr. 63). He indicated the problem was "fairly well gone" but he still had "a little equilibrium problem." (Tr. 63). He

-6-

stated he gets lightheaded if he moves quickly. (Tr. 63). This only happens when he is on his feet. (Tr. 64).

Vestal's wife, Carol, was called to testify. (Tr. 64). However, she indicated she believed everything had been covered. (Tr. 64).

Jim Spragins a vocational expert was called to testify. (Tr. 65). The ALJ asked Spragins several hypothetical questions. In each, Spragins was asked to assume they were talking about an individual who was the same age, educational, and vocational background as Vestal. (Tr. 66).

In the first hypothetical, Spragins was asked to assume the hypothetical person only had the RFC to perform sedentary work with the further limitation that the person needed to be able to sit and stand at will. (Tr. 66). Spragins testified this person could perform unskilled sedentary work such as a cashier or an assembler. (Tr. 66).

Spragins was then asked whether the hypothetical person who had the limitations testified to by Vestal could maintain a job in the regional or national economy. (Tr. 67). Spragins testified these limitations would prevent the individual from maintaining employment. (Tr. 68).

If the person was limited to a maximum of two hours of standing and walking in a work day and two hours of sitting in a work day, Spragins testified this would eliminate the sedentary jobs he had identified. (Tr. 68). Further if the person had non-exertional limitations which seriously limited his ability to deal with the public, ability to interact with supervisors, ability to deal with work stresses, ability to function independently, ability to maintain attention and concentration, ability to understand, remember and carry out complex job instructions, ability to behave in an emotionally stable manner, ability to relate predictably in social situations and

-7-

the ability to demonstrate reliability, Spragins testified the cumulative nature of these limitations would prevent a person from working.  (Tr. 69).

The record contains the following medical and vocational evidence.  On August 17, 2000, Vestal filled out a disability supplemental interview outline.  (Tr. 168-172).   He listed his weight as 200 and height as 5' 6".  (Tr. 168).  He indicated he could bathe, dress, and shave himself and take care of his own hair care needs.  (Tr. 168).  He also indicated he could do dishes and mow the lawn. (Tr. 168).  He stated he could not change sheets, iron, vacuum/sweep, take out the trash, do home repairs, repair appliances, repair or wash the car, rake leaves, or do garden work because he had pain stooping, bending, "standing for a period," or "sitting for a period." (Tr. 168).

He stated he had never shopped for groceries or clothes but could do the banking, and go to the post office.  (Tr. 168).  He stated he prepared meals twice a week including meats and vegetables.  (Tr. 169).  He indicated it took him an hour and a half to prepare a meal and took longer since his disability began.  (Tr. 169).

He indicated he could pay bills, use a check book, and count change.  (Tr. 169).  He stated he could drive including unfamiliar routes and could walk for exercise.  (Tr. 169).   He did not use any assistive devices.  (Tr. 169).  He spends his time attending church, watching TV, listening to the radio,  reading, and visiting friends and relatives.  (Tr. 169).  He stated he did some walking, sitting, or swimming, in the pool.  (Tr. 169).

Vestal indicated his disability interfered with his ability to work because he was unable to sit and ride for a period of time.  (Tr. 169).  He also indicated he had difficulty getting in and out of vehicles and lifting and moving objects.  (Tr. 169).

-8-

He indicated he suffered from unusual fatigue and had to rest once a day for half an hour to an hour. (Tr. 170). He described his pain as a burning pain located in the lower back and down both legs. (Tr. 170). He indicated the pain lasted all day and interfered with his ability to sleep. (Tr. 170).

He stated the pain was caused by bending, lifting, sitting, walking, and standing. (Tr. 170). He stated he could stand or walk about half an hour before the pain occurred and could sit about half an hour. (Tr. 170). He indicated an extended amount of time sitting, walking, or standing made the pain worse. (Tr. 170). He stated ice packs, sitting in water, and the TENS unit made the pain better. (Tr. 170).

Since his disability began, Vestal indicated his mental state had changed and he had very patience and could not tolerate being with more than one or two people at a time. (Tr. 171). On an average day, he stated he sat outside and had coffee, took a short walk, rested in front of the TV, visited family, took an afternoon nap, "piddle[d]" outside awhile, and then went to bed. (Tr. 171).

On August 1, 2002, Vestal completed a second supplemental interview outline. (Tr. 573-582). On this one, the only household chores he indicated he could do was to take out the trash. (Tr. 573). He stated he could do the banking and go to the post office but was unable to walk "for a period of time." (Tr. 578).

Vestal indicated he no longer prepared any meals and could drive but not on unfamiliar routes. (Tr. 579). He also indicated he could not walk for exercise or errands. (Tr. 570). He indicated he no longer did any type of recreational activities. (Tr. 579).

AO72A
(Rev. 8/82)

He indicated he suffered from unusual fatigue and took a nap once a day for two to three hours. (Tr. 580). He stated he had a burning pain down both his legs and back and also chest pain. (Tr. 580). He indicated this pain lasted all the time. (Tr. 580).

On June 29, 1993, Vestal injured himself when he fell off a ladder climbing down from an asphalt trailer. (Tr. 219). An MRI of his lumbar spine revealed central protrusion or herniation at L4-5 causing mild impingement on the thecal sac and a mild bulge at L5-S-1. (Tr. 270). On May 24, 1994, Dr. Guy O. Danielson, III, performed a two level anterior lumbar interbody fusion, L4-5, L5-S1 with BAK instrumentation implant on Vestal. (Tr. 256).

Following out patient physical therapy, on October 3, 1994, it was determined Vestal was qualified to return to light medium duty work. (Tr. 248). In March, April and May of 1995, Vestal underwent selective nerve root blocks, medial branch blocks, and bilateral L3-4 facet injections. (Tr. 233, 232, 238, 239, 245). The pre-operative diagnoses was failed back syndrome with chronic mechanical low back pain. (Tr. 232, 233, 239, 242). Following the nerve block at L5, Vestal reported little change in his pain. (Tr. 240). Following the nerve block at L4, Vestal reported good relief of his leg pain but his back pain had returned. (Tr. 234). Following the facet injections, it was noted Vestal had left hip and leg pain greater than the right. (Tr. 232). Vestal noted no particular change in his pain following the injections. (Tr. 232). Following the medial branch blocks at L4-5 and L5-S1, Vestal reported good relief from the pain. (Tr. 242-243).

On July 18, 1995, Vestal underwent bilateral medial branch block at L2 and L3 with paravertebral contrast injections. (Tr. 227-228). Vestal noted no significant relief from the pain.

-10-

(Tr. 228). On October 23, 1995, Vestal was given a whole person impairment of 16% based on multiple operative levels and abnormal range of motion studies. (Tr. 196-197).

On November 26, 1996, Vestal underwent provocative lumbar discography L3-4, L4-5, and L5-S1. (Tr. 204-205). He obtained fairly good relief from his back pain. (Tr. 205).

In April 18, 1997, Vestal was being seen by Dr. Jonathan Blau. (Tr. 337-338). He noted Vestal had severe reactive depression that was now resistant to Paxil. (Tr. 337). After close questioning, Dr. Blau believed Vestal had periodic episodes of hypomania and believed Vestal's true diagnosis was bipolar disorder. (Tr. 337). Dr. Blau noted this disorder was often seen in chronic back pain patients. (Tr. 337).

Dr. Blau attempted to wean Vestal off Paxil and start him on Serzone and Lithium. (Tr. 337-338). He also attempted to slowly wean Vestal off pain medication. (Tr. 337). Vestal did not respond well to the Serzone and Lithium and was put back on the Paxil. (Tr. 313).

On December 30, 1997, Dr. Robert Gatti noted that Vestal had been under a great deal of anxiety resulting in depression disorder. (Tr. 217). Dr. Gatti noted Vestal responded to Paxil well. (Tr. 217). It was noted the Paxil also helped Vestal with the back pain. (Tr. 199-201).

On December 23, 1998, an x-ray of Vestal's lumbar spine revealed the BAK prosthesis was in good position with no abnormal motion. (Tr. 203). On July 29, 1999, Dr. Robert Gatti noted that Vestal would benefit from more training, possibly in an air conditioned area. (Tr. 214). He stated that the training should be in an area that would alleviate some of the heavy straining and lifting of Vestal's present job. (Tr. 214).

AO72A
(Rev. 8/82)

In December 1999, Dr. Gatti noted Vestal was still having problems with numbness in his lower extremities. (Tr. 213). Pursuant to Vestal's request, Dr. Gatti referred Vestal to Dr. Robert Henderson. (Tr. 213).

On February 1, 2000, Dr. Gatti indicated that a job in telephone sales was appropriate for Vesta. (Tr. 211). The job description indicated the job would be full-time and involve sitting an average of 5 hours per day, walking two hours per day, would rarely involve kneeling or bending, would frequently involve fine manipulation with the hands and simple grasping (26%-66% of the time), standing two hours per day, and would occasionally involve pushing/pulling (11%-25%). (Tr. 211).

Dr. Gatti also indicated that a job as a new car salesperson was appropriate for Vestal. (Tr. 212). The job description indicated the job would be full-time and involve sitting an average of three hours per day, walking six hours per day, standing six hours per day, would rarely involve operating a motor vehicle, kneeling, lifting, squatting, bending or twisting, and would occasionally involve operating foot pedals, fine manipulation with the hands, reaching, pushing/pulling and simple grasping (11%-25%). (Tr. 212).

On February 21, 2000, a lumbar myelogram was performed by Dr. Robert Henderson. (Tr. 223). It demonstrated no movement at the fused levels and no segmental instability of the L3-4 segment. (Tr. 223).

Dr. Henderson diagnosed Vestal as having some nerve root impingement at L4-5 and L5-S1. (Tr. 287). Dr. Henderson recommended Vestal undergo nerve root decompression at these two levels. (Tr. 287).

-12-

On April 12, 2000, a second opinion was obtained from Dr. M. Joseph Shephard. (Tr. 271-272). He agreed with the with Dr. Henderson's recommendation based upon Vestal's response to the selective nerve root blocks and confirmatory studies. (Tr. 272). On May 23, 2000, Vestal underwent the decompression surgery. (Tr. 281).

Following the decompression surgery, Vestal indicated his leg pain was better but he still had back pain with any activity. (Tr. 298). On July 12, 2000, Vestal underwent functional testing. (Tr. 305). As part of the testing he was asked to give various activities a score between 0 and 100 that best described his ability to do the activity. (Tr. 305). Zero indicated he could do the activity for as long as he liked without pain. (Tr. 305). One hundred meant the pain prevented him from doing the activity at all. (Tr. 305). He scored the various activities as follows: able to maintain personal care (80) (Tr. 308); able to lift (90) (Tr. 308); able to walk (50) (Tr. 308); able to sit (40) (Tr. 308); able to stand (40) (Tr. 305); able to sleep (50) (Tr. 305); able to maintain a social life (60) (Tr. 305); and able to travel (40) (Tr. 305). He was also asked to rate his back and leg pain. (Tr. 306). Zero was no pain and no medication required. (Tr. 306). One hundred meant pain as bad as it could be using prescribed medication at the maximum frequency ordered. (Tr. 306). Vestal was asked to mark the scale between 0 and 100 that best described his low back pain and leg pain over the course of the last seven days. (Tr. 306). He marked back pain at 60 and leg pain at 70. (Tr. 306).

On August 14, 2000, Dr. David Richter signed a certification form for Vestal to obtain a handicap license plate or placard. (Tr. 301). He stated that Vestal was permanently unable to walk one hundred feet without stopping to rest. (Tr. 301). He was examined by Dr. David Richter on August 15, 2000, who noted Vestal was tender to palpation over the paraspinous

-13-

muscles and had pain with straight leg raise. (Tr. 298). Vestal had a normal distal neurovascular exam except for on the left leg and there was a 1+ reflex at the ankle and knee. (Tr. 298). Dr. Richter's assessment was low back pain and neuropathy. (Tr. 298).

On September 27, 2000, Dr. Henderson reiterated the following permanent activity restrictions on Vestal: no twisting, no lifting greater than twenty-five pounds, no prolonged periods of lifting, bending, stooping, sitting, standing, pushing or pulling. (Tr. 302). *See also* (Tr. 311)(same restrictions placed on Vestal by Dr. Henderson on January 22, 2000). Dr. Henderson noted that if Vestal exceeded these limitations it could cause him further injury or exacerbations to his back and the consequences could be very severe. (Tr. 302).

Vestal continued on Darvocet and Paxil. (Tr. 298). In October of 2000, Vestal reported using two Darvocet a day without any break through pain. (Tr. 295). His prescription was refilled. (Tr. 295).

On November 16, 2000, Susan Farque, a vocational analyst, concluded Vestal had the RFC to perform light work. (Tr. 177). She indicated he could lift a maximum of twenty pounds and frequently lift and/or carry ten pounds. (Tr. 177). She stated he could stand or walk a total of six hours per 8-hour day and sit a total of six hours per 8-hour day. (Tr. 177). She stated Vestal could do occasional balancing, climbing, crawling, crouching, kneeling, and stooping. (Tr. 177).

In early January 2001, Vestal fell on his lower back. (Tr. 301). He suffered some aggravated back pain after that. (Tr. 301).

On May 29, 2001, a physical residual functional capacity assessment was completed by Dr. Robert Redd, a medical consultant. (Tr. 343-350). With respect to exertional limitations,

-14-

it stated Vestal could occasionally lift or carry twenty pounds; could frequently lift or carry ten pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and his ability to push and pull was unlimited, other than as shown for lift and/or carry. (Tr. 344). With respect to postural limitations, it stated Vestal could only occasionally engage in climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. 345). No manipulative, visual, communicative, or environmental limitations were established. (Tr. 346-347).

On November 8, 2001, a medical source statement of ability to do work related activities completed by Dr. Richter was forwarded to the Office of Hearing and Appeals. (Tr. 351). Dr. Richter indicated Vestal could occasionally lift or carry less than ten pounds and could frequently lift less than this weight. (Tr. 352). Dr. Richter indicated Vestal should stand or walk less than 2 hours in an 8-hour workday and sit less than 2 hours in an 8-hour workday. (Tr. 352-353). Vestal was also limited in the lower extremities as far as pushing and pulling were concerned. (Tr. 353).

Dr. Richter indicated Vestal should never engage in climbing, balancing, kneeling, crouching, or crawling. (Tr. 353). Dr. Richter stated Vestal had continuous back pain and a limited range of motion. (Tr. 353). He noted his examination was confirmatory. (Tr. 353).

With respect to manipulative limitations, Dr. Richter noted that Vestal was unable to bend and reach and limited in fingering (fine manipulation). (Tr. 354). Dr. Richter noted Vestal should not be exposed to temperature extremes, vibration, humidity/wetness, or hazards such as machinery or heights. (Tr. 354).

AO72A
(Rev. 8/82)

On November 8, 2001, Vestal was admitted to the hospital complaining of chest pain. (Tr. 360, 626-630). It was determined he suffered an acute myocardial infarction. (Tr. 368). On November 12, 2001, Vestal underwent a left heart catheterization with selective coronary angiography. (Tr. 358). Dr. Bishop's diagnostic impression was listed as: "Two vessel disease with a high grade stenosis of a small marginal branch and subtotal occlusion of obtuse marginal two which is the infarct vessel. (Tr. 359). There is LV wall motion abnormality secondary to the infarct." His recommendation was that Vestal be treated with medication. (Tr. 359).

On November 23, 2001, Vestal was treated for labyrinthitis. (Tr. 390-395, 622-624).

On February 23, 2002, Vestal underwent a psychological evaluation by Dr. Steve Shry. (Tr. 383-386). Vestal was functioning within the average range intellectually and his scores on achievement tests indicated he was capable of near average level work in the areas of reading, spelling, and arithmetic. (Tr. 385). In regard to the personality tests, Dr. Shry noted he was:

> struck by the disconnect between the impressions received in the clinical interview in which claimant appeared to be fairly intact with no evidence of psychotic process or even severe anxiety and tension compared with the claimant's performance on the self report scales. Claimant, in fact, appeared to be fairly relaxed during the interview but did evidence a certain amount of discomfort, having to get up and move about the office. On the personality tests, claimant appeared to be checking nearly all of the items involving severe psychopathology. Either claimant is exaggerating symptomatology as a plea for help, or he had difficulty expressing to the examiner the severity of his problems. The possibility of malingering, also, cannot be ruled out.
>
> Claimant has been supposedly diagnosed in the past with Manic Depression and may have been responding to some of the items based on his past history with that disorder. Finally, claimant is on numerous medications to control depression, which could help in enabling him to present during interview in a more relaxed way than the testing demonstrates. There certainly is a wide gap between claimant's presentation during interview and the personality test results, which raises some doubt as to claimant's openness in the interview situation. This examiner hesitates to make a diagnosis based on the evaluation at this time and defers to previous medical evaluations. Claimant does appear able to handle

-16-

most employment situations in terms of his mental capabilities. Whether he can handle employment based on physical disability needs to be assessed by physicians.

(Tr. 385-386).

Dr. Shry also completed a medical assessment regarding Vestal's ability to do work-related activities (mental). (Tr. 387-388). In connection with this evaluation, the term good was defined as the "ability to function in this area is limited but satisfactory" and the term fair was defined as the "ability to function in this area is seriously limited, but not precluded.". (Tr. 387). Dr. Shry indicated Vestal had good ability to follow work rules and relate to co-workers, to use judgment, to understand, remember and carry out detailed, but not complex, job instructions, to understand, remember and carry out simple job instructions, and to maintain personal appearance. (Tr. 387-388). Dr. Shry indicated Vestal had fair ability to deal with the public, interact with supervisors, deal with work stresses, function independently, maintain attention concentration, understand, remember and carry out complex job instructions, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (Tr. 387-388 1).

On September 19, 2002, Dr. Alice Davidson, a medical consultant, completed a physical residual functional capacity assessment. (Tr. 645-652). With respect to exertional limitations, it stated Vestal could occasionally lift or carry ten pounds; could frequently lift or carry less than ten pounds; could stand and/or walk at least two hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and his ability to push and pull was unlimited, other than as shown for lift and/or carry. (Tr. 646). With respect to postural limitations, it stated Vestal could only occasionally engage in climbing, balancing, stooping, kneeling, crouching, and

-17-

crawling. (Tr. 647). No manipulative, visual, communicative, or environmental limitations were established. (Tr. 648-649).

On February 5 2003, Dr. Jose Alemparte performed a cardiac catheterization on Vestal during which four stents were placed. (Tr. 433-454). Vestal had not been followed by cardiology after his heart attack in November of 2001. (Tr. 435). An echocardiogram taken on February 5, 2003, estimated Vestal's left ventricular ejection fraction at 54%. (Tr. 476).

On February 5, 2003, George Ootsey, a vocational analyst, concluded Vestal had the RFC to do a full range of sedentary work. (Tr. 591). Ootsey noted Vestal could lift a maximum of 10 pounds and occasionally lift and/or carry less than ten pounds. (Tr. 591). He further noted he could stand and/or walk a total of two hours, sit a total of six hours, and was restricted to only occasional stooping, crawling, crouching, climbing, kneeling, and balancing. (Tr. 591).

On October 17, 2003, Vestal was referred to Dr. Donald E. Shows by Dr. Richter because of chest pain. (Tr. 716-718). Dr. Shows recommended a cardiac catheterization. (Tr. 718). The catheterization was performed on December 9, 2003. (Tr. 721). The test revealed non-obstructive coronary artery disease, stents in both the right coronary artery and the first obtuse marginal branch, and mildly decreased left ventricular function (computer calculated ejection fraction was 45%). (Tr. 722). Dr. Shows recommended medical therapy. (Tr. 722).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be

AO72A
(Rev. 8/82)

affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past

-19-

relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Discussion**:

In this case, we believe remand is necessary for a number of reasons. First, we believe the ALJ failed to properly evaluate Vestal's mental impairment. As the Eighth Circuit has noted, "[t]he evaluation of a mental impairment is often more complicated than the evaluation of a claimed physical impairment." *Vester v. Barnhart*, 416 F.3d 886, 892-893 (8th Cir. 2005). The ALJ found Vestal's depression to be non-severe. (Tr. 22). However, in doing so, he stated that he gave controlling weight to the findings of Dr. Shry. (Tr. 22).

Although the ALJ noted the inconsistency between the statement contained in Dr. Shry's written evaluation to the effect that Vestal appeared "able to handle most employment situations in terms of his mental capabilities," (Tr. 386), and Dr. Shry's assessment of Vestal as being seriously limited in making occupational, personal-social and performance adjustments (Tr. 387-388), the ALJ without explanation indicated Dr. Shry's "overriding opinion" was that Vestal was "fully capable" of handling most employment situations and that Vestal's pain was the primary limiting factor in his functional abilities. (Tr. 22). Dr. Shry's written evaluation does not refer in anyway to his assessment of Vestal's abilities to do work related activities on a day to day basis. (Tr. 384-386, 387-388). Dr. Shry offers no explanation of his statement contained in his evaluation and does not attempt to reconcile the results of the evaluation and the separate

-20-

assessment of Vestal's ability to do work related activities. Despite this apparent inconsistency, Dr. Shry was not asked to explain his findings.

Second, we find the ALJ failed to properly evaluate Vestal's subjective complaints of pain. In disability determinations, credibility assessments are the province of the ALJ. *Onstead v. Sullivan*, 962 F.2d 803, 805 (8th Cir. 1992). This court will not substitute its judgment for that of the trier of fact, *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996), nor will we disturb the decision of any ALJ who seriously considers, but for good reason explicitly discredits, a claimant's testimony of disabling pain. *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993).

In this case, the ALJ's decision recited the relevant factors that must be considered in evaluating a claimant's allegations of disabling pain. The ALJ notes that Vestal has experienced substantial back and heart difficulty but then states that Vestal has been "receiving what has been tantamount to no more than routine medical treatment for any and all of the subjective complaints, which have either been treated successfully or are being successfully controlled with non-surgical treatments at this time." (Tr. 24). He further found the medical evidence was not supportive of the degree of restriction claimed to exist by Vestal. (Tr. 24).

As noted above, the medical records indicate multiple attempts have been made to lessen Vestal's back and leg pain by means of nerve blocks, injections, etc. Vestal additionally has a history of using narcotic medication in an attempt to control or manage the pain. The ALJ then discounted Vestal's assertion of constant pain and significant limitations without discussing any limitations the pain would have on his ability to perform job related functions. *Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir. 2002)(*citing Polaski v. Heckler*, 739 F.2d1320, 1322 (8th Cir. 1984)). *See also Forehand v. Barnhart*, 364 F.3d 984, 988 (8th Cir. 2004)("We have

-21-

long stated that to determine whether claimant has the residual functional capacity necessary to be able to work we look to whether she has the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.")(internal quotation marks and citation omitted).

The ALJ also discounted Vestal's subjective complaints of pain because he was able to drive, cook, swim, handle his finances, and live with his wife and help run the household. (Tr. 24). "A claimant 'need not prove that [his] pain precludes all productive activity and confines [him] to life in front of the television' in order to prove [his] disability." *Ellis v. Barnhart*, 392 F.3d 988, 999 (8th Cir. 2005)(citations omitted). We note that in the second supplemental interview outline Vestal completed he indicated his activities were much more limited than he did in the first supplemental interview outline. *Compare* (Tr. 168-172) and (Tr. 573-582).

Third, the ALJ failed to explain why he discounted the functional limitations identified by Dr. Richter, plaintiff's treating physician, in a medical source statement of ability to do work-related activities (physical). (Tr. 352-354). Dr. Richter, among other things, indicated Vestal could stand and/or walk for less than 2 hours in an 8-hour workday and sit for less than 2 hours in an 8-hour workday. (Tr. 352-354). While the ALJ mentions Dr. Richter's records, the ALJ concludes there are no objective findings to support a finding that Vestal has a debilitating decrease in his ability to preform work-related activities. (Tr. 26). Dr. Richter, however, indicates that his assessment of Vestal's ability to do work-related activities was confirmed by his examination. (Tr. 353). While the ALJ may have had valid reasons for discounting Dr. Richter's assessment, the ALJ failed to explain his reasons.

AO72A
(Rev. 8/82)

**Conclusion**:

For the reasons stated, the court finds that the decision of the Commissioner denying benefits to the plaintiff should be reversed and the case remanded to the Commissioner. A separate judgment in accordance with this opinion will be entered.

Dated this 26th day of January 2006.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

**AO72A**
**(Rev. 8/82)**